# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-1727
_____

32nd Street Surgery Center, LLC

*Plaintiff - Appellant*

v.

Right Choice Managed Care; HMO Missouri, Inc.

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Western District of Missouri - Joplin

_____

Submitted: November 18, 2015
Filed: April 26, 2016

_____

Before COLLOTON, GRUENDER, and SHEPHERD, Circuit Judges.

_____

GRUENDER, Circuit Judge.

32nd Street Surgery Center, LLC ("32nd Street") sued insurance provider HMO Missouri, Inc. and administrator RightCHOICE Managed Care, Inc. (collectively, "insurers")[1] for quantum meruit, unjust enrichment, vexatious refusal to pay an

_____

[1]RightCHOICE provides certain administrative services for HMO Missouri, including provider contracting, but does not itself underwrite healthcare claims.

insurance claim, and injunctive relief arising out of medical services provided to the insurers' insureds. The district court[2] granted the insurers' motion for summary judgment and denied 32nd Street's motion to compel discovery. 32nd Street now appeals. We affirm.

## I.

The insurers issue health insurance policies to groups and individuals. These policies establish the method and rates for the reimbursement of insureds' medical claims. All of the insurers' policies contain essentially the same language regarding the maximum allowable amount at which the insurers will reimburse claims, with the amount differing only as between network providers and non-network providers. A network provider is a medical-service provider who has negotiated a contract to participate in one or more of an insurer's coverage networks, while a non-network provider does not have such a contract. The benefits of participating in an insurer's networks include increased patient volume and marketing and promotion by the insurer. In exchange for these benefits, a network provider generally agrees to receive discounted reimbursement rates.

In the relevant geographical area, the insurers offer six different networks: Blue Access, Blue Access Choice, Blue Preferred/Blue Preferred Plus, Blue Traditional, Medicare Advantage HMO, and Medicare Advantage PPO. When an insured receives services from a non-network provider, the insurers reimburse the insured directly. However, when a service provider is a network provider, the insurers reimburse the provider directly, pursuant to the network-provider contract.

---

[2]The Honorable Gary A. Fenner, United States Judge for the Western District of Missouri.

-2-

Medical-service provider 32nd Street has operated as an outpatient ambulatory surgical center in Joplin, Missouri since July 2008. Until May 22, 2011, 32nd Street was a non-network provider with respect to the insurers. During that time, the insurers reimbursed their insureds directly for services provided by 32nd Street according to the maximum allowable amount in each insured's policy. On May 22, 2011, 32nd Street entered into an ancillary-provider agreement with the insurers to become a network provider. The agreement defines a network provider as "a provider who [insurer] has designated to participate in one or more Networks . . . as designated on the signature page and/or the Plan Compensation Schedule." The signature page of the ancillary-provider agreement provides that 32nd Street "will be designated as a Network Provider in the following Programs: . . . Blue Traditional." Central to the current dispute, the agreement also contains an out-of-network-compensation provision, specifying the compensation that applies when an ancillary service provider renders services to insureds who belong to any of the insurers' networks for which the provider is not a network provider.

After 32nd Street joined the Blue Traditional network pursuant to the ancillary-provider agreement, the insurers began to pay 32nd Street directly. The insurers paid 32nd Street the maximum allowable amount at the Blue Traditional rate, even for non-Blue-Traditional insureds' claims. 32nd Street, believing that it was entitled to receive "reasonable rates" and that the Blue Traditional rates were not reasonable, responded by using the insurers' appeals system to appeal every claim in which the insurers paid Blue Traditional rates for insureds belonging to non-Blue-Traditional networks. When these appeals proved unsuccessful, 32nd Street responded by filing this action in federal district court in December 2012.

In its complaint, 32nd Street asserted seven counts: (1) breach of reimbursement obligations pursuant to 29 U.S.C. § 1132, (2) quantum meruit, (3) unjust enrichment, (4) breach of contract – breach of duty of good faith and fair dealing, (5) declaratory judgment, (6) injunctive relief, and (7) vexatious refusal. The

district court granted the insurers' motion to dismiss with respect to the breach-of-reimbursement-obligation, breach-of-contract, and declaratory-judgment claims. After discovery, the insurers moved for summary judgment as to the remaining counts, while 32nd Street filed a motion to compel the insurers to produce data and work papers from 2003, 2008, and 2012 and to produce memoranda from 2003, 2005, 2008, and 2012. 32nd Street asserted that these documents were relevant to uncovering the methodologies the insurers used to determine the maximum-allowable rates for out-of-network providers. The court denied the motion to compel, finding the 2003, 2008, and 2012 documents irrelevant and the 2005 memorandum protected by attorney-client privilege. The court also granted the insurers' motion for summary judgment on the claims of quantum meruit, unjust enrichment, vexatious refusal, and injunctive relief. 32nd Street now appeals.

## II.

We review *de novo* a district court's grant of summary judgment. *Evance v. Trumann Health Servs., LLC*, 719 F.3d 673, 677 (8th Cir. 2013). Summary judgment is appropriate only when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Raines v. Safeco Ins. Co. of Am.*, 637 F.3d 872, 874 (8th Cir. 2011).

The district court found that contracts governed the rates at which the insurers were obligated to reimburse services 32nd Street rendered to insureds both before and after the ancillary-provider agreement. The court concluded that, before the ancillary-provider agreement, the insurance policies established the rate at which the insurers would reimburse their insureds' claims. Later, the ancillary-provider agreement set forth the maximum rates at which 32nd Street would be reimbursed for services provided to all insureds covered by the insurers, not only Blue Traditional insureds. The district court found that, through the ancillary-provider agreement, 32nd Street

-4-

had agreed to accept reimbursement at the Blue Traditional rate even when the insureds belonged to one of the insurers' other networks. The district court concluded that these express contracts barred 32nd Street's quantum meruit and unjust enrichment claims. Similarly, the court concluded that 32nd Street's vexatious-refusal claim failed because the insurers had paid the amounts due under those contracts. Finally, the court found that, because 32nd Street did not go into business until 2008 and because the 2011 ancillary-provider agreement controlled how the insurers reimbursed 32nd Street for claims of insureds from both the Blue Traditional and the insurers' other networks, all the work papers and memoranda 32nd Street sought to compel were irrelevant, except for the 2005 memorandum. However, the court found this memorandum protected by attorney-client privilege. Accordingly, the district court granted summary judgment in favor of the insurers as to the quantum-meruit, unjust-enrichment, and vexatious-refusal claims and denied 32nd Street's motion to compel.

A.

32nd Street first argues that the district court erred by rewriting an unambiguous contract through its interpretation of the ancillary-provider agreement. 32nd Street asserts that Section 2.33, which sets forth the reimbursement rates that apply to claims from insureds who participate in networks for which the provider is not a "network provider," does not apply to it because it participates as a network provider in the Blue Traditional network. Instead, 32nd Street argues, the ancillary-provider agreement governs reimbursement only for Blue Traditional insureds, while Missouri law requires the insurers to make "reasonable payments" for services rendered to insureds belonging to the insurers' five other networks. Such "reasonable payments," according to 32nd Street, would result in higher compensation to 32nd Street for claims of non-Blue-Traditional insureds. The district court, however, rejected 32nd Street's reading as rendering Section 2.33 meaningless. We agree.

-5-

"Interpretation of an insurance policy is a matter of state law." *Gohagan v. Cincinnati Ins. Co.*, 809 F.3d 1012, 1015 (8th Cir. 2016) (quoting *Progressive N. Ins. Co. v. McDonough*, 608 F.3d 388, 390 (8th Cir. 2010)). Here, Missouri law applies because Missouri is the forum state, and neither party has argued that the law of any other state applies. *See id*. "[T]he primary rule of [contract] construction is to give effect to the parties' intent, which is to be determined solely from the four corners of the contract itself." *Comp & Soft, Inc. v. AT & T Corp.*, 252 S.W.3d 189, 194 (Mo. Ct. App. 2008). "In construing contractual provisions, this court is to avoid an interpretation that renders other provisions meaningless." *Nodaway Valley Bank v. E.L. Crawford Constr., Inc.*, 126 S.W.3d 820, 827 (Mo. Ct. App. 2004).

We begin with the plain language of the ancillary-provider agreement. The agreement defines "Network Provider" as "a provider who [insurer] has designated to participate in one or more Networks. Provider is a Network Provider as designated on the signature page and/or the Plan Compensation Schedule." Section 2.33, the "Out of Network Compensation" provision central to this dispute, provides, in relevant part:

> In the event [32nd Street] is not a Network Provider as specified below, [32nd Street] shall receive compensation, remuneration or reimbursement as set forth in this provision. Provision 2.33.1 shall apply to ANCILLARY PROVIDER's [sic] who are required by Plan to submit Claims on a UB-04 claim form or its successor.

32nd Street argues that Section 2.33 does not apply to a provider who participates in *any* of the six networks. It asserts that the definition of network provider as one "designated to participate in one or more Networks" specifically allows for a provider to participate in only one network. 32nd Street argues that because it is a network provider in the Blue Traditional network, Section 2.33 does not apply to it. However, this argument ignores the next sentence in the definition: "Provider is a Network Provider as designated on the signature page and/or the Plan Compensation

Schedule." Both locations designate 32nd Street as participating in the Blue Traditional network and as not participating in the five other networks. Thus, 32nd Street is a network provider in the Blue Traditional network, but, for the other networks, 32nd Street "is not a Network Provider as specified below." Section 2.33 therefore controls 32nd Street's compensation for claims arising from the five other networks.

Within Section 2.33, "Provision 2.33.1 shall apply to ANCILLARY PROVIDER's [sic] who are required by Plan to submit Claims on a UB-04 claim form." Because the ancillary-provider agreement requires 32nd Street to submit all of its claims on a UB-04 claim form, Section 2.33.1 applies. According to this provision:

> In the event ANCILLARY PROVIDER's participation is limited to [Blue] Traditional . . . ANCILLARY PROVIDER shall accept, unless otherwise required by statute, regulation, or the Covered Individual's [policy], the Company Rate for [Blue] Traditional as set forth in the Plan Compensation Schedule(s) . . . .

Under these terms, because 32nd Street's participation indeed is "limited to [Blue] Traditional," 32nd Street also must accept the Blue Traditional rates for services rendered to insureds on the five other networks. The Ambulatory Surgical Center Network Participation attachment to the ancillary-provider agreement lends further support to this reading of Sections 2.33 and 2.33.1. This attachment states that 32nd Street "agrees to accept compensation in accordance with the Out of Network Compensation provision of the Agreement, or as otherwise provided in the Covered Individual's Health Benefit Plan" for any services 32nd Street performs for insureds "NOT supported by a Network designated on [32nd Street's] Plan Compensation Schedule." Again, 32nd Street has agreed to have its compensation governed by the "Out of Network Compensation provision"—*i.e.*, Section 2.33—whenever it provides

services to an insured not covered by the "Network designated on [32nd Street's] Plan Compensation Schedule"—*i.e.*, the Blue Traditional network.

The plain language of these provisions thus supports the district court's conclusion that, in the ancillary-provider agreement, 32nd Street agreed to accept the Blue Traditional rate for services rendered to insureds belonging to *all* of the insurers' networks.

B.

32nd Street next argues that the district court erred by finding that the insureds' policies with the insurers before the ancillary-provider agreement and, later, the ancillary-provider agreement, barred 32nd Street's quantum meruit and unjust enrichment claims. 32nd Street asserts that the insurers engaged in three types of "unjust and inequitable" practices: (1) sending reimbursement payments to insureds instead of directly to 32nd Street, (2) failing to pay "reasonable amounts" for 32nd Street's services, and (3) from the date the ancillary-provider agreement went into effect, reimbursing at Blue Traditional rates for services provided to insureds belonging to non-Blue-Traditional networks. The district court found these equitable claims barred by the contracts governing the reimbursement rates paid by the insurers: first, insureds' policies with the insurers, then, from May 22, 2011 onward, the ancillary-provider agreement. We agree.

Under Missouri law, quantum meruit and unjust enrichment are separate, but related, remedies in quasi-contract. *Johnson Grp., Inc. v. Grasso Bros.*, 939 S.W.2d 28, 30 (Mo. Ct. App. 1997); *see also Comp & Soft*, 252 S.W.3d at 196 ("[T]he purpose of quantum [meruit] is to prevent unjust enrichment."). However, Missouri law does not allow a plaintiff to maintain an action for either of these quasi-contract remedies when an express contract governs the subject matter for which recovery is sought. *Lowe v. Hill*, 430 S.W.3d 346, 349 (Mo. Ct. App. 2014) (barring recovery

-8-

under an equitable theory when there is "an express contract for the very subject matter for which [plaintiff] seeks to recover"); *see also Burrus v. HBE Corp.*, 211 S.W.3d 613, 619 (Mo. Ct. App. 2006) ("[A] plaintiff may not maintain an action in *quantum meruit* where the plaintiff's relationship with the defendant is governed by an existing contract."); *R & R Land Dev., L.L.C. v. Am. Freightways, Inc.*, 389 S.W.3d 234, 243 (Mo. Ct. App. 2012) ("[I]f the plaintiff has entered into an express contract for the very subject matter for which he seeks recovery, unjust enrichment does not apply, for the plaintiff's rights are limited to the express terms of the contract."). In such cases, "the plaintiff's sole theory of recovery must lie on the contract." *Burrus*, 211 S.W.3d at 619.

In the previous section, we established that, once effective, the ancillary-provider agreement obligated 32nd Street to accept the Blue Traditional reimbursement rate for all insureds' claims across the insurers' networks. We thus turn to the relationship between 32nd Street and the insurers before the ancillary-provider agreement. During that time, the insurers' policies with their insureds set forth the method and rates for the reimbursement of claims for services rendered by both network providers and non-network providers. Before entering into the ancillary-provider agreement, 32nd Street was a non-network provider. For a non-network provider, the terms of the policies provide for a maximum allowable amount of reimbursement equal either to an "amount negotiated" or, "[i]n the absence of a negotiated amount," an amount that "[insurers] shall have discretionary authority to establish." Non-network providers then had the right to seek to recover from the insureds any difference between the amount billed and the maximum allowable amount through a practice known as "balance billing." Accordingly, these policies governed the rates the insurers were obligated to pay for 32nd Street's services to insureds before the ancillary-provider agreement took effect—the insurers were not obligated to pay their insureds more than the rates set forth in the policies. The parties do not dispute that the insurers directly reimbursed their insureds for healthcare

-9-

services provided by 32nd Street at the rate established in the insureds' policies.[3] 32nd Street chose not to engage in balance billing, opting instead to collect only deductibles, co-payments, and co-insurance amounts. We thus agree with the district court's conclusion that express contracts governed the rates at which the insurers were obligated to provide reimbursement for healthcare services 32nd Street rendered to the insurers' insureds—first, the insureds' policies, then, later, the ancillary-provider agreement. Because express contracts govern and the insurers undisputedly already have paid the amounts due under those contracts, we also agree with the district court's determination that those contracts bar 32nd Street's quantum meruit and unjust enrichment claims. *See Lowe*, 430 S.W.3d at 349.

32nd Street nevertheless contends that, before the ancillary-provider agreement, it lacked contractual privity with the insurers. This argument proves unavailing. As noted above, Missouri law does not permit recovery in quantum meruit or unjust enrichment when "the plaintiff's relationship with the defendant is governed by an existing contract." *Burrus*, 211 S.W.3d at 619. A relationship may be governed by a set of existing contracts even without contractual privity if, "[d]espite the absence of privity, the agreements, when read together, clearly intend to govern the rights and obligations of the parties with respect to payment." *Comp & Soft*, 252 S.W.3d at 196. We agree with the district court that the insureds' policies and the ancillary-provider agreement "clearly intend to govern" the amounts the insurers were obligated to pay on behalf of their insureds for 32nd Street's services. Before the ancillary-provider agreement, the policies the insurers issued to their insureds established the maximum allowable amount at which the insurers provided reimbursement for services rendered

---

[3]On this point, 32nd Street highlights instances in its suggestions in opposition to summary judgment in which it described as controverted that the insurers had paid "a fair rate" or "reasonable value" for 32nd Street's services. This evidence, however, merely asserts 32nd Street's opinion as to the "reasonableness" of the defendants' payments without disputing the fact that the insurers actually paid at the rates established in the policies.

by 32nd Street. Later, the ancillary-provider agreement expressly governed payments due to 32nd Street for services rendered to insureds across all of the insurers' networks. Accordingly, because contracts governed the insurers' payment obligations for 32nd Street's services at all times relevant to this litigation, 32nd Street's argument fails. *See Lowe*, 430 S.W.3d at 349. The district court thus did not err by granting summary judgment for the insurers on 32nd Street's quantum meruit and unjust enrichment claims.

## C.

32nd Street next argues that the district court erred by granting summary judgment on its claim for vexatious refusal to pay an insurance claim under Missouri Revised Statute § 375.420 because the insurers violated the statute by failing to pay "reasonable amounts" to 32nd Street and by issuing reimbursement payments to insureds instead of directly to 32nd Street.[4] Missouri's vexatious-refusal statute states:

> In any action against any insurance company to recover the amount of any loss under a policy of . . . health . . . or other insurance . . . , if it appears from the evidence that such company has refused to pay such loss without reasonable cause or excuse, the court or jury may, in addition to the amount thereof and interest, allow the plaintiff damages . . . .

Mo. Rev. Stat. § 375.420. Courts have interpreted a claim under this statute to require a plaintiff to prove three elements: (1) an insurance policy, (2) the insurer's refusal to pay, and (3) refusal without reasonable cause or excuse. *D.R. Sherry Constr., Ltd. v. Am. Family Mut. Ins. Co.*, 316 S.W.3d 899, 907 (Mo. 2010).

---

[4]Although the parties dispute whether the vexatious-refusal statute encompasses RightCHOICE as an insurance administrator, for the purposes of our analysis we assume without deciding that the statute applies to RightCHOICE.

Given these requirements, as the district court noted, 32nd Street fails to establish any genuine issue of material fact that the insurers refused to pay an amount due under an insurance policy. Indeed, 32nd Street does not argue that the insurers failed to pay an amount due under an insurance policy, contending instead that, before the ancillary-provider agreement, the insurers' unreasonable reimbursement rates and issuance of reimbursements directly to insureds instead of to 32nd Street amount to refusals to pay a "loss" under the statute. In light of our determination that contracts—first, the insurance policies and later, the ancillary-provider agreement—controlled the amounts the insurers were obligated to pay for 32nd Street's services, we fail to see how the insurers' undisputed payment pursuant to those contracts could constitute a refusal to pay a loss under them. Additionally, although the policies "authorize [insurers] to make payments directly to Providers for Covered Services," that language does not *obligate* the insurers to do so. Even if the insurers' reimbursement practices somehow were to comprise the requisite "refusal," however, we conclude that those practices occurred pursuant to contracts and not "without reasonable cause or excuse" as both the statute and the case law require. *See State Farm Mut. Auto. Ins. Co. v. Shahan*, 141 F.3d 819, 824 (8th Cir. 1998) (applying the Missouri vexatious-refusal statute in finding that "refusal to pay . . . based on the clear and unambiguous language of the insurance policies" is "clearly not without reasonable cause"). The district court thus did not err in granting summary judgment to the insurers on the vexatious-refusal claim.

D.

Finally, we address 32nd Street's argument that the district court abused its discretion by denying 32nd Street's motion to compel production of the insurers' internal documents. 32nd Street argues that, because the insurers used the methodologies contained in a series of data, work papers, and memoranda from 2003, 2005, 2008, and 2012 to determine the maximum allowable amount of reimbursement for non-network providers, those documents were relevant to 32nd Street's claims of

inadequate reimbursement. We review a district court's discovery rulings "in a manner 'both narrow and deferential,' and reversal is only warranted if an erroneous ruling amounted to a 'gross abuse of discretion.'" *Robinson v. Potter*, 453 F.3d 990, 994-95 (8th Cir. 2006). In light of our determination that express contracts governed the rates at which the insurers provided reimbursement for 32nd Street's services at all times relevant to this litigation, we see no relevance of the requested documents, including the 2005 memorandum the district court found to be protected by attorney-client privilege. Accordingly, the district court's denial of 32nd Street's motion to compel could not have been "an erroneous ruling." *Id.* at 994. We thus find no abuse of discretion.

### III.

For the reasons set forth above, we affirm the district court's grant of summary judgment in favor of HMO Missouri and RightCHOICE.

_____